NO.
12-06-00031-CV

 

IN THE COURT OF APPEALS 

 

TWELFTH COURT OF APPEALS DISTRICT

 

TYLER, TEXAS

THE STATE OF TEXAS     §                      APPEAL FROM THE 

 

FOR THE BEST INTEREST          §                      COUNTY COURT AT LAW

 

AND PROTECTION OF
J.H.         §                      CHEROKEE COUNTY, TEXAS

 

 



MEMORANDUM OPINION

            J.H. appeals
from an order of commitment for temporary inpatient mental health services and
an order to administer psychoactive medication. 
After a hearing without a jury, the trial court ordered J.H. committed
to Rusk State Hospital for a period not to exceed ninety days and entered an
order authorizing the Texas Department of Mental Health and Mental Retardation
to administer psychoactive medication to J.H. 
In four issues, J.H. asserts the evidence is legally and factually
insufficient to support the orders and the trial court violated his rights to
freedom of religion and speech when it granted the State’s application to
administer psychoactive medication.  We
affirm.

 

Background








            On
January 24, 2006, an application for court ordered temporary mental health
services was filed requesting the court commit J.H. to Rusk State Hospital for
a period not to exceed ninety days.  The
application was supported by a certificate of medical examination for mental
illness, prepared by a physician, Dr. Jon Guidry, who had examined J.H. on
January 23.  Dr. Guidry diagnosed J.H. as
suffering from Bipolar Disorder I, manic with psychosis.  He found that J.H. is mentally ill and likely
to cause serious harm to others.  He also
found that J.H. is suffering severe and abnormal mental, emotional, or physical
distress, is experiencing substantial mental or physical deterioration of his
ability to function independently, which is exhibited by his inability to
provide for his basic needs, and is unable to make a rational and informed
decision as to whether or not to submit to treatment.  

            Dr.
Guidry reached these conclusions because, on January 23, J.H. had said “I
stopped all my medications” and had allegedly been threatening in the
community.  J.H. exhibited pressured
speech, tangentiality, and threatened a lawsuit if admitted to the
hospital.  Dr. Guidry found that J.H.
presents a substantial risk of serious harm to himself or others if not
immediately restrained, an opinion he based on J.H.’s behavior.  Dr. Guidry formed this opinion because J.H.
said “[w]hatever they said is a false report” and “I stopped all my medications
months ago.”  

            On
January 24, 2006, J.H. was examined by Dr. G. Paul Kula who then also prepared
a certificate of medical examination for mental illness.  Dr. Kula diagnosed J.H. with Bipolar
Disorder, type I, current episode manic, severe, with psychotic features.  He also indicated that J.H. is mentally ill
and likely to cause serious harm to others. 
He further determined that J.H. is suffering severe and abnormal mental,
emotional, or physical distress, is experiencing substantial mental or physical
deterioration of his ability to function independently, which is exhibited by
his inability to provide for his basic needs, and is unable to make a rational
and informed decision as to whether or not to submit to treatment.  Dr. Kula further determined that J.H.
presents a substantial risk of serious harm to himself or others if not immediately
restrained, as demonstrated by J.H.’s behavior. 
He came to these conclusions because J.H. said “I decided to stop all my
medication” and “I do not have Bipolar Disorder.”  Also, J.H. threatened other people in the
community, made vague threats to Dr. Kula if he did not release J.H.
immediately, and refused his medication. 


            Dr.
Kula testified at the hearing, explaining that he diagnosed J.H. with Bipolar
Disorder, current episode manic, with psychotic features.  He testified that J.H. is likely to cause
serious harm to others.  He explained
that the nurses have felt threatened by his demands and demeanor.  He is a large man and because he presents
himself with “active vigor,” they feel he may lose control of himself.  He has a high potential to do something
physical if he does not get what he wants and loses his temper.  The doctor reviewed J.H.’s psychiatric and
social history and his mental status exam, as well as statements by the mental
health authority of the referring county that evaluated him.  He explained that J.H. denies any illness, and
although he was on medication for physical and mental health problems, he now
refuses to take any medication.  J.H. is
very intense and, when the doctor does not agree with him, J.H. makes legal
threats against the doctor, threatening to take him to the Board or to sue the
hospital.  J.H. has not slept in five to
fourteen days, which the doctor explained could make a person psychotic.  J.H. stays up all night writing out what he
calls legal opinions that he plans to present to the Supreme Court.  Dr. Kula explained that untreated psychosis
causes not only a chemical imbalance, but also anatomical brain damage.  Part of the brain shrinks or dies and no
longer responds to any medication.  J.H.
also suffers from benign nonessential tremor, which he denies.  He has hypertension, which, if untreated,
puts him at risk for congestive heart failure or stroke.  

            Dr.
Kula testified that J.H. does not appreciate the danger of his decision making.
J.H. claims to have legal expertise as well as a medical degree that he
received in Galveston.  J.H.’s basic
judgment is pervasive and affects multiple areas of his life.  The doctor “would not trust him in public to
do the right thing.”  Dr. Kula would not
want him driving a car because, in addition to his significant tremor, manic
patients tend to drive recklessly.  In
his hyper state, his actions are unpredictable. 
Manic patients have no appreciation of their reckless approach toward
living.  If something were to happen
causing him to need medical treatment, he would not handle that
appropriately.  He does not appreciate
the fact that he has any medical condition of any kind.  J.H. says God will take care of him and that
is why he does not need any medical care. 
He sees himself as a religious person and is proud of the fact that he
is a 32nd degree Mason.  Dr. Kula does
not believe J.H. could go to a restaurant and interact with people without
causing a disturbance because he is “amazingly hyperactive.”  He is effusive and expansive in his
personality and has a need to preach to people. 


            Dr.
Kula explained that this is a “textbook case of full-blown mania with psychotic
features.  The psychosis is grandiose and
delusional, related to having a legal background, medical background, having a
special relationship with G-D that is beyond what we normally say is a
relationship with G-D.”  The doctor
explained that this is a genetic condition that starts out as depression.  The doctor’s diagnosis was based on his
examination of J.H., review of the medical history, and reasonable medical
probability.  He explained that, if J.H.
does not take his medications, there might be spontaneous resolution of the
manic episode in two to four months. 
During that time period, J.H. will continue to damage his brain.  The doctor stated that J.H. needs to be
hospitalized.  He could not receive
appropriate treatment as an outpatient because he would not take his
medication.  

            On
cross examination, Dr. Kula testified that J.H. has not received any emergency
injections since being in the hospital and is not on any observation
status.  When admitted to Rusk State
Hospital, he did not allow them to take his blood pressure. But the referring
hospital noted a history of hypertension and that his blood pressure was
elevated on admission.  The doctor
explained that they attempted to have J.H. transferred to a VA hospital but he
would not cooperate.  He would not sign
consent forms to allow them to contact the VA or his family.  J.H. claims to have post traumatic distress
disorder from the Korean War.  However,
Dr. Kula said J.H. does not give a history consistent with that.  J.H. might have post traumatic distress, “but
until you scrape away this overriding illness, you are not going to see it.”  

            Upon
questioning by the court, Dr. Kula explained that J.H.’s failure to recognize
his hypertension problem and accept treatment for it is caused by the mental
illness.  If he does not treat it, the
most immediate danger would likely be decompensated congestive heart failure or
he could have a stroke.  J.H.’s failure
to treat the condition that places him at risk for further brain damage is
caused by mental illness.  J.H. has
engaged in the recent overt act of staying up all night every night since he
has been at Rusk State Hospital.  This
has caused him to become more and more grandiose.  The day before the hearing, he began claiming
to have a medical degree.  He is becoming
worse and worse from sleep deprivation. 
Eventually, the sleep deprived begin to hallucinate and have all kinds
of psychotic symptoms.  Staying up all
night will make him more agitated and will create a threat to others.  The court asked what has been observed that
indicates J.H. is having distress from the mental illness.  Dr. Kula explained that he starts talking
and, when people do not respond or acknowledge that he is correct, he becomes
more and more intense and argumentative and attempts to convince people.  Some of the nurses feel threatened and are
afraid he might lose his temper.  Staying
up night after night and not sleeping is a sign of distress.  If he stays up seven days in a row at the
hospital, Dr. Kula will likely order emergency medication to help him
sleep.  That medication would help him to
be less agitated but would not address his underlying mood instability.

            On
further cross examination, Dr. Kula agreed that J.H. has been respectful of the
court proceedings.  He explained that
most bipolar people have higher than average IQs, are crafty, and know how to
pull off things like that in public.  For
a brief period of time they can keep themselves held together.

            J.H.
testified in his own behalf.  He said he
would like to be released but would go to the VA hospital.  He opined that his post traumatic distress
disorder is well confirmed and documented in his medical records.  He said he has no problem sleeping and does
not have high blood pressure.  He
explained that “they had all kinds of trouble with the machine.”  He said the doctors at the rehabilitation
center said he has the best cardiovascular number they have ever seen.  He denied having any problems.  When asked if he could live at home and pay
his bills, he responded that he had been doing it for years and has been
functioning without any problems.  He
purchases groceries and drives a car. 
Again, he said there is no problem whatsoever.  He respectfully requested and/or demanded to
be released on a writ of habeas corpus, on his own recognizance, to tend to his
business.  He also stated that he did not
need to be medicated by force.  He
explained that Dr. William Ray is going to assist him in getting documentation
for the Agent Orange damage that causes his tremors.  He said that is documented in the VA
records.  He explained that he is a past
commander of the VFW post and a life member of the Masonic Lodge, Scottish
Rite, and Sharon Shriners.  He said he
has no problems and he is not worried about attacking anyone.  He has started writing his autobiography and
hopes all those in court will buy his book when he is finished with it.

            On
cross examination, J.H. said he questions Dr. Kula’s credentials regarding his
knowledge of environmental medicine and contamination from toxic
chemicals.  He said he was exposed to
Agent Orange while in Korea, insisting that Agent Orange was used in World War
II and the Korean War.  He denied having
a medical degree, explaining that he had attended classes and received “mini”
diplomas issued by the University of Texas Medical Branch in Houston.  He said he did not tell Dr. Kula that he had
a medical degree and complained that the doctor does not listen when he
talks.  He also stated that the doctor
has not reviewed his records, particularly his spiritual records, the records
that document his spirituality.  They are
notarized affidavits that he prepared showing that he accepts Jesus Christ as
his personal savior and explaining his total understanding and acceptance of
Almighty God.  He plans to put these
affidavits in his autobiography.  When
asked where he lives, J.H. responded, “Well, I live right here, but I stay at
different places.  I have had a post
office box and lived in Pearland since 1963. 
I was born in Connecticut in a log house.  I am an original Texas Ranger.”  When asked where he would go if released, he
responded, “I would go about conducting my business, writing my
autobiography.  Now, let me explain
something.  When I was ambushed and
kidnapped the other day, I had just finished a session with Mel Gamble, who is
a retired US Air Force colonel.”  He then
explained that he has rented a house and that he is a real estate broker.  His license will expire in April of this year
and he needs some continuing education classes. 
He receives Social Security and union retirement checks.

            In
response to questioning by the court, J.H. said he was born in 1934 and was in
the Korean War in 1954 and 1956.  He then
clarified that Congress had never declared war. 
It was a police action.  

 
          The trial court entered
an order for temporary inpatient mental health services after determining that
the evidence supports the allegations that J.H. is mentally ill and that he is
likely to cause serious harm to others. 
The court also found that J.H. is suffering severe and abnormal mental,
emotional, or physical distress, experiencing substantial mental or physical
deterioration of the ability to function independently, and is unable to make a
rational and informed decision as to whether to submit to treatment.  The court ordered J.H. committed to Rusk
State Hospital for a period not to exceed ninety days.  

            A
separate hearing was then held on the State’s application for court ordered
administration of psychoactive medication. 
Dr. Kula testified that J.H. is under an order for temporary mental
health services and has verbally refused to accept medication.  He stated that J.H. lacks the capacity to
make a decision regarding the administration of psychoactive medications
because he has bipolar disorder with psychotic features and the resulting
psychosis has impaired his judgment.  The
doctor believes that the requested medications are in J.H.’s best
interest.  If treated, the patient will
benefit, the benefits outweigh the risks, and J.H.’s stay will likely be
shortened.  If J.H. exhibits negative
side effects, he would change or stop the medication.  J.H. told the doctor that God was providing
him with primary care for his medical, psychiatric, and spiritual
conditions.  If not medicated, the result
would be prolonged hospitalization, brain damage, and development of medication
treatment resistance.  

            On
cross examination, Dr. Kula said he spent hours trying to explain to J.H. what
the medications are for, but J.H. has no insight.  J.H. did not want the medications because he
said they are synthetic and create brain damage.  Nurses and doctors are there twenty four
hours a day to watch him for side effects. 
The doctor explained that the natural course of untreated mania is from
two to four months.  However, J.H.’s lack
of sleep is a problem.  J.H. told the
doctor that God will take care of any medical needs he has so he does not need
Dr. Kula’s type of medical care.  But
J.H. denied having any medical or psychiatric conditions.  He can participate in group therapy to get
him to focus on what is really going on and how he appears to others.  If authorized to medicate J.H., the doctor
would speak to him about adverse side effects to medications he has had in the
past and will attempt to take J.H.’s wishes into account.  

            J.H.
testified, offering to present his medical history to the court.  He said that he does have medical problems.  He specifically indicated he wanted the judge
to review his VA papers that he filed a week before the hearing, before he was
ambushed and unlawfully detained.  J.H.
stated that the doctor hates his guts because J.H. is a Master Mason and the
doctor is Catholic.  J.H. said the doctor
laughed at his records because he did not understand.  He explained that God created him and gave
him food as his medicine.  He no longer
takes medication for his medical problems because he wants to get rid of the
toxins in his system and get back to his basic metabolic level.  He believes the medication is toxic and
therefore chooses not to take it.  At the
close of evidence, the court entered an order to administer psychoactive
medication for the period of temporary commitment.

 

Sufficiency
of the Evidence

Standard of Review

            In
a legal sufficiency review where the burden of proof is clear and convincing
evidence, the reviewing court must consider all of the evidence in the light
most favorable to the finding to determine whether a reasonable trier of fact
could have formed a firm belief or conviction that its finding was true.  In re J.F.C., 96 S.W.3d 256,
266 (Tex. 2002).  The reviewing court
must assume that the factfinder resolved disputed facts in favor of its finding
if a reasonable factfinder could do so.  Id.  A court should disregard all evidence that a
reasonable factfinder could have disbelieved or found to have been
incredible.  Id.

            In
addressing a factual sufficiency of the evidence challenge, we must consider
all the evidence in the record, both that in support of and contrary to the
trial court’s findings.  In re C.H.,
89 S.W.3d 17, 27-29 (Tex. 2002).  This
court must give due consideration to evidence that the factfinder could
reasonably have found to be clear and convincing.  Id. at 25.  We must determine whether the evidence is
such that a factfinder could reasonably form a firm belief or conviction about
the truth of the State’s allegations.  Id.  We must consider whether disputed evidence is
such that a reasonable trier of fact could not have reconciled that disputed
evidence in favor of its finding.  In
re J.F.C., 96 S.W.3d at 266. 
Appellate courts retain deference for the constitutional roles of the
factfinder.  In re C.H., 89
S.W.3d at 26.  The trier of fact is the
exclusive judge of the credibility of the witnesses and the weight to be given
their testimony.  See id.
at 27; In re J.J.O., 131 S.W.3d 618, 632 (Tex. App. -- Fort Worth
2004, no pet.).

Commitment Order

            In
his first issue, J.H. asserts the evidence is neither legally nor factually
sufficient to support the order of commitment. 
He argues that the evidence does not show an overt act or continuing
pattern of behavior tending to confirm that he is likely to cause serious harm
to others or would be unable to care for his basic needs.  Thus, he argues, the State failed to meet its
evidentiary burden under the statute. 

            Applicable
Law 

            The
trial judge may order a proposed patient to receive court ordered temporary
inpatient mental health services if the judge or jury finds, from clear and
convincing evidence, that the proposed patient is mentally ill and, as a result
of the mental illness he is likely to cause serious harm to himself, is likely
to cause serious harm to others, or is (i) suffering severe and abnormal
mental, emotional, or physical distress, (ii) experiencing substantial mental
or physical deterioration of his  ability
to function independently, which is exhibited by his inability, except for reasons
of indigence, to provide for his basic needs, including food, clothing, health,
or safety, and (iii) unable to make a rational and informed decision as to
whether or not to submit to treatment.  Tex. Health & Safety Code Ann. §
574.034(a) (Vernon 2003).  “Mental
illness” means an illness, disease, or condition, other than epilepsy,
senility, alcoholism, or mental deficiency, that substantially impairs a person’s
thought, perception of reality, emotional process, or judgment, or grossly
impairs behavior as demonstrated by recent disturbed behavior.  Tex.
Health & Safety Code Ann. § 571.003(14) (Vernon Supp. 2006).  To be clear and convincing under the statute,
the evidence must include expert testimony and, unless waived, evidence of a
recent overt act or a continuing pattern of behavior that tends to confirm
either the likelihood of serious harm to the proposed patient or others, or the
proposed patient’s distress and the deterioration of his ability to
function.  Tex. Health & Safety Code Ann. § 574.034(d) (Vernon
2003).

            Discussion

            The
State provided expert testimony explaining that J.H. is mentally ill and
describing his behavior.  Dr. Guidry
stated in his certificate of medical examination that J.H. stopped taking his
medications months before being admitted to the hospital, had been threatening
in the community, threatened litigation if admitted, and exhibited pressured
speech and tangentiality.  Dr. Kula
stated in his certificate that J.H. stopped taking his medication and denied
having Bipolar Disorder.  Also, J.H.
threatened people in the community and Dr. Kula and refused to take medication.


            Dr.
Kula testified that J.H. is manic with psychotic features.  He has not slept in several days, which can
make a person psychotic.  The doctor explained
that J.H. has a significant tremor and hypertension.  Left untreated, he is susceptible to brain
damage and congestive heart failure or stroke. 
His basic judgment and decision making abilities are impaired.  J.H. is grandiose and delusional, believing
himself to have both a legal background and a medical background, as well as a
special relationship with God.  He is
hyperactive, argumentative, and very intense. 
When people do not respond to him or agree with him, he becomes more
so.  Therefore, he could not interact
with people in public without causing a disturbance.  His actions are unpredictable and he has a
reckless approach to living.  Dr. Kula
recommended against driving and said J.H. would not handle medical emergencies
appropriately.  The doctor testified that
J.H. needs to be hospitalized to receive appropriate treatment.  Thus, the record contains expert testimony of
a recent overt act, staying awake for several days in a row,  that tends to confirm J.H.’s distress and the
deterioration of his ability to function as exhibited by his inability to
provide for his basic needs, including health and safety.  See K.L.M. v. State, 735 S.W.2d
324, 326 (Tex. App. -- Fort Worth 1987, no writ).  The trial court could have disbelieved J.H.’s
testimony to the contrary.  See In
re J.F.C., 96 S.W.3d at 266. 

            Considering
all the evidence in the light most favorable to the findings, we conclude a
reasonable trier of fact could have formed a firm belief or conviction in the
truth of the finding that J.H. is suffering severe and abnormal mental,
emotional, or physical distress, experiencing substantial deterioration of his
ability to function independently, and unable to make a rational and informed
decision as to whether to submit to treatment. 
Id.  The evidence
presented satisfies the statutory requirement for clear and convincing evidence
in support of the order for temporary inpatient mental health services.  See Tex.
Health & Safety Code Ann. § 574.034(d).  The evidence is legally sufficient to support
the trial court’s order.  See In re
J.F.C., 96 S.W.3d at 266.          In addressing J.H.’s factual sufficiency
complaint, we consider the evidence the factfinder could reasonably have found
to be clear and convincing.  In re
C.H., 89 S.W.3d at 25.  J.H.
testified that he does not have a problem sleeping and does not have high blood
pressure.  He said he has no problem
whatsoever, should be released from the hospital, and does not need medication.  The trial court was entitled to disbelieve
J.H.’s testimony and disregard evidence contrary to the State’s position.  See id. at 27.  In light of the entire record, the evidence
that the trial court could not have credited in favor of its findings is not so
significant that it could not reasonably form a firm belief or conviction that
J.H. is suffering severe distress, experiencing substantial deterioration of
the ability to function, that is, to provide for his health and safety needs,
and unable to make a rational decision regarding treatment.  See id.  Thus, the evidence is factually sufficient to
support the trial court’s finding. 
Because we hold the evidence is both legally and factually sufficient to
support the trial court’s order, we overrule J.H.’s first issue.

Psychoactive Medication

            In
his second issue, J.H. asserts the trial court erred in entering an order
authorizing administration of psychoactive medication.  He argues that his refusal to take medication
was based on his religious beliefs and is not sufficient evidence of an overt
act or continuing pattern that would demonstrate his distress or inability to
function.  He further argues that the
State did not present evidence that he lacks the capacity to make a decision
regarding the use of psychoactive medication. He contends that the record shows
he merely disagrees with the doctor, based on his religious beliefs and his
concern for ill side effects.

            Applicable
Law      

            The
court may enter an order authorizing the administration of psychoactive
medication if it finds by clear and convincing evidence that the patient is
under an order for inpatient mental health services, the patient lacks the
capacity to make a decision regarding the administration of the proposed
medication, and treatment with the proposed medication is in the best interest
of the patient.  Tex. Health & Safety Code Ann. § 574.106(a) (Vernon Supp.
2006).  The Health and Safety Code
defines capacity as a patient’s ability to understand the nature and
consequences of a proposed treatment, including the benefits, risks, and
alternatives to the proposed treatment, and make a decision whether to undergo
the proposed treatment.  Tex. Health & Safety Code Ann. §
574.101(1) (Vernon 2003). 

            Discussion

            Dr.
Kula testified that J.H.’s psychosis has impaired his judgment and he therefore
lacks the capacity to make a decision regarding the administration of
psychoactive medication.  Without the
medication, the result would be prolonged hospitalization, brain damage, and
medication treatment resistance.  Dr.
Kula had previously testified that J.H. completely denied having any medical or
mental problems.  The doctor spent hours
trying to explain to J.H. what the medications are for.  Due to his lack of insight, J.H. did not
understand.

            Considering
all the evidence in the light most favorable to the findings, we conclude a
reasonable trier of fact could have formed a firm belief or conviction that
J.H. lacked the capacity to make a decision regarding administration of the
proposed medication and that the treatment with the proposed medication is in
J.H.’s best interest.  See In
re J.F.C., 96 S.W.3d at 266. 
This evidence satisfies the statutory requirement for clear and
convincing evidence in support of the order for administration of psychoactive
medication.  See Tex. Health & Safety Code Ann. §
574.106(a), (a-1) (Vernon Supp. 2006). 
The evidence is legally sufficient to support the trial court’s
order.  See In re J.F.C.,
96 S.W.3d at 266.








            In
addressing J.H.’s factual sufficiency complaint, we consider all the evidence,
giving due consideration to evidence the factfinder could reasonably have found
to be clear and convincing.  In re
C.H., 89 S.W.3d at 25.  J.H.
testified that, although he has medical problems, he chooses not to take
medication because it is toxic.  He
relies instead on food as his medicine. 
Dr. Kula assured the court that the hospital has medical personnel on
duty around the clock and, if J.H. were to experience adverse side effects from
the medication, they would change his medication.  In light of the entire record, the evidence
that the trial court could not have credited in favor of its findings is not so
significant that the trial court could not reasonably form a firm belief or
conviction that J.H. lacks the capacity to make a decision regarding the
administration of the proposed medication and that treatment with the proposed
medication is in his best interest.  See
id.  Thus, the evidence is
factually sufficient to support the trial court’s findings. See Tex. Health & Safety Code Ann. §
574.106(a).  Because we hold the evidence
is both legally and factually sufficient to support the trial court’s order to
administer psychoactive medication, we overrule J.H.’s second issue. 

 

Constitutional
Rights

Freedom of Religion

            In
his third issue, J.H. asserts that the order to administer psychoactive
medication violates his right to freedom of religion.  He explains that his refusal to take
medication is based upon his deeply felt religious beliefs.  Therefore, forced medication violates his
constitutional right to freedom of religion. 
J.H. did not raise this issue in the trial court.  See Tex.
R. App. P. 33.1(a).  A
constitutional claim must have been asserted in the trial court to be raised on
appeal.  Dreyer v. Greene,
871 S.W.2d 697, 698 (Tex. 1993). 
Therefore, J.H. has not preserved this complaint for review.  Accordingly, we overrule J.H.’s third issue.

Freedom of Speech

            In
his fourth issue, J.H. contends the trial court erred in ordering the
administration of psychoactive medication in violation of his right to freedom
of speech.  His argument in support of
this issue is identical to the argument in support of his third issue.  The reasoning is elusive.  At trial, defense counsel objected to the
application for court ordered administration of psychoactive medication on the
ground that it is a violation of J.H.’s freedom of speech explaining that use
of medication attempts to alter the chemicals in his brain, thereby altering
his thought processes.

            Freedom
of speech is constitutionally protected. 
U.S. Const. amend. I; Tex. Const. art. I, § 8.  J.H. has not clearly argued how the right to
freedom of speech is implicated here.  In
applying for the order to administer psychoactive medication, the State was
seeking to manage J.H.’s mental illness, not regulate his thoughts.  The State was not seeking to control the
content of his mind. See Stanley v. Georgia, 394 U.S. 557, 565,
89 S. Ct. 1243, 1248, 22 L. Ed. 2d 542 (1969) (holding that obscene thoughts
cannot be prohibited).  Furthermore, at
times, state action to protect legitimate state interests may affect the actor’s
thoughts.  See Paris Adult Theatre
I v. Slaton, 413 U.S. 49, 67, 93 S. Ct. 2628, 2640-41, 37 L. Ed. 2d 446
(1973).  The constitutional right to
freedom of speech is not implicated here. 
We overrule J.H.’s fourth issue.

Conclusion

            The
evidence is legally and factually sufficient to support the trial court’s order
of commitment for temporary inpatient mental health services and the order for
administration of psychoactive medication. 
Further, J.H. has waived review of his freedom of religion complaint and
has not raised a valid freedom of speech complaint.

            We
affirm the trial court’s orders of commitment for temporary
inpatient mental health services and for administration of psychoactive
medication. 

 

 

                                                                                                     JAMES T. WORTHEN    

                                                                                                                 Chief Justice

 

 

Opinion
delivered October 4, 2006.

Panel consisted of Worthen,
C.J., Griffith, J., and Hoyle, J.

 

 

 

 

 

 

 

 

 

 

 

 

 

(PUBLISH)